IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:11-CV-356 |
| | ) | |
| 998 COTTON STREET, FORSYTH COUNTY, NORTH CAROLINA, WITH ALL APPURTENANCES AND IMPROVEMENTS THEREON, | ) ) ) ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

THOMAS D. SCHROEDER, District Judge.

This case is an <u>in rem</u> civil action for forfeiture of Defendant real property located at 998 Cotton Street in Winston-Salem, North Carolina ("Property"), based on its alleged connection to illegal drug activity. Before the court is the motion of the United States of America ("Government") for summary judgment. (Doc. 14.) Veronica Enciso Arreola ("Claimant") has asserted a claim to the Property and responded to the Government's motion (Docs. 19, 20), and the Government has replied (Doc. 21). The court heard argument on the motion on February 21, 2013, and the Government filed an additional brief responsive to the court's inquiry at the hearing. (Doc. 22.) For the reasons set out below, the Government's motion for summary judgment will be granted.

## I.   PROCEDURAL HISTORY

The Government brought this action by verified complaint on May 9, 2011, pursuant to 21 U.S.C. § 881(a) for the forfeiture of the Property, which the Government alleges (1) was used or intended to be used to commit or to facilitate the commission of a violation of the Controlled Substances Act ("Act") and (2) constitutes proceeds traceable to the exchange of controlled substances in violation of the Act. (Doc. 1 ¶ 1.) The Government also brings this action pursuant to 18 U.S.C. § 981(a)(1)(C), alleging the Property constitutes or was derived from proceeds traceable to an offense as defined in 18 U.S.C. § 1956(c)(7) or from a conspiracy to commit such offense, in this case the alleged sale of a controlled substance in violation of state and federal law. (Id. ¶ 2.)

Gaudencio Cruz Cardenas ("Cardenas") is the record owner of the Property, a residence in Winston-Salem, North Carolina. (Doc. 1-2.) Cardenas has not appeared in the action, but Claimant, who alleges she is married to Cardenas, has filed a Verified Notice of Claim (Doc. 9) and answer to the complaint (Doc. 10). She asserts a marital interest in the Property under North Carolina law, denies there is any legal basis for forfeiture, and contends she is an "innocent owner."

When filing the complaint, the Government did not request authority to seize the Property but did file a lis pendens. See

2

18 U.S.C. § 985(b)(1)(A) (with limited exceptions, real property subject to a civil foreclosure action shall not be seized before entry of an order of forfeiture).  The Government now seeks summary judgment.  (Doc. 14.)

## II.  FACTUAL BACKGROUND

The evidence in the light most favorable to the Claimant is as follows.

### A.  Cardenas' Involvement in Controlled Substances and Acquisition of the Property

In 2003, the Winston-Salem Police Department received information from a confidential, reliable source that certain apartments were being used to distribute cocaine hydrochloride. The police used the source to make a controlled purchase of cocaine.  An individual, identified as "Macias," was observed going between different apartments, including the apartment in which a controlled drug buy occurred.  Macias left the apartment complex in a Chevrolet Suburban with an individual later identified as Cardenas.  (Doc. 1-1 ¶¶ 5-6.)

The police subsequently undertook searches, which resulted in the seizure of eight pounds of marijuana, 215 grams of crystal methamphetamine, and over one kilogram of cocaine.  (Id. ¶ 7.)  After his arrest, Macias stated that an individual later identified as Cardenas instructed him to distribute narcotics. Macias also provided information that he and Cardenas had

3

recently picked up one kilogram of cocaine hydrochloride, which Cardenas instructed Macias to sell at the apartment complex. However, Macias was arrested before he could do so, and the police found one kilogram of cocaine in his vehicle. (Id. ¶¶ 7-8.)

As a result of the investigation, Cardenas was convicted on January 29, 2004, in Forsyth County Superior Court of felony attempted trafficking in cocaine, felony possession with intent to sell and deliver marijuana, felony possession with intent to sell and deliver methamphetamines, and felony maintaining a vehicle for the violation of the Controlled Substances Act.[1] Cardenas was released from custody in April 2004. (Id. ¶¶ 9-10.)

Two-and-one-half years later, on October 24, 2006, Cardenas acquired the Property by deed for a purchase price of

---

[1] Claimant asserts that the declaration of Donald Carter, Senior Special Agent with the United States Department of Homeland Security, incorrectly states Cardenas' 2004 state court convictions ("Carter Declaration"). The declaration lists charges and then states Cardenas was convicted of all charges. (Doc. 1-1 ¶ 9.) Claimant does not, however, contest that at least one of the drug convictions carries a potential sentence greater than one year. Rather, she suggests that the alleged inaccuracy brings into question other statements made in the declaration. The charges listed by both the Government and Claimant, however, are essentially the same. (See Doc. 1-1 ¶ 10; Doc. 21 at 4 n.1). Indeed, Agent Carter's omission of "attempted" with respect to the cocaine trafficking conviction does not differ from the description in the North Carolina Department of Public Safety Offender Public Information database. There is no question that Cardenas was convicted of multiple drug trafficking charges involving cocaine, marijuana, and methamphetamine in January 2004. The slight discrepancies do not bring into question other statements in the declaration.

4

$54,739.27. (Doc. 15-12 (Government's Exhibit: HUD Settlement Statement).) The deed names Cardenas solely; no other person, including Claimant, is a record title holder. (See Doc. 1-2 (North Carolina General Warranty Deed).) The HUD statement reflects that Cardenas made a $5,000.00 down payment and covered the balance by assuming two deeds of trust on the Property, one for $29,739.27 and one for $20,000.00. (Doc. 15-12.) Cardenas also was responsible for an additional $2,516.94 in closing costs and adjustments, for a total out-of-pocket cost at closing of $7,516.94. (Id.) A Government exhibit shows satisfaction of the first deed of trust on June 9, 2011 -- five years after Cardenas purchased the property (and, as will be seen, three years after he became a fugitive). (Id.)

Fourteen days after purchasing the Property, Cardenas placed a $55,100.00 high bid on a different piece of real property in a local foreclosure proceeding. He obtained title to this second property, also in his name only, in December 2006. (Doc. 1-1 ¶ 14; Doc. 15-13.) Under North Carolina law, his foreclosure purchase eliminated any junior liens -- so there were no prior mortgages to be assumed on this property, In re Foreclosure of Lien by Ridgeloch Homeowners Ass'n, Inc. Against McNeill, 182 N.C. App. 464, 469, 642 S.E.2d 532, 536 (2007), and the record does not reflect any mortgage or deed of trust placed on the property subsequent to the purchase which might indicate

an underlying loan pursuant to which money had been advanced for payment of the bid price. Therefore, the Government's evidence reflects that Cardenas purchased this property for $55,100.00 in cash.[2]

Over a year after purchasing the Property, Cardenas came under further investigation by Winston-Salem police in early 2008, based on information law enforcement received that a Hispanic male known as "Chato" was distributing large quantities of crystal methamphetamine in the Winston-Salem area. As part of the investigation, on March 5, 2008, an undercover police detective arranged the purchase of one-half pound of methamphetamine from "Chato," who officers determined to be Cardenas, through one of Cardenas' confederates. Cardenas refused to meet with the undercover officer but set up a drug sale at a local McDonald's restaurant; Cardenas directed that the $6,000.00 payment be made to him at the Property, and a confidential source made the delivery of funds in the kitchen of the residence. (Doc. 1-1 ¶¶ 11-13; Doc. 15-1 ¶¶ 3-6.)

---

[2]   If any mortgage or deed of trust senior to the foreclosed deed of trust existed on this property, it would continue despite payment of the foreclosure sale price of $55,100.00.  See Shaikh v. Burwell, 105 N.C. App. 291, 293, 412 S.E.2d 924, 926 (1992) ("If the trustee is only foreclosing on the junior deed of trust, the senior lien continues with the property and the trustee must sell subject to the senior lien.  Therefore, the purchaser at the foreclosure sale of a junior lien purchases the property subject to senior liens." (internal citations omitted)).  Any senior mortgages or deeds of trust would affect what a bidder would be willing to bid, but that factor would have been taken into account in Cardenas' bid of $55,100.00.

6

On March 17, 2008, Winston-Salem police officers surveilled the Property. (Doc. 15-1 ¶ 7.) Officers observed numerous Hispanic males arriving one morning and staying for only short periods of time. A mini-van with license plates registered to Cardenas was parked in the driveway, and Cardenas was observed at the Property throughout the morning. (Id.)

On March 20, 2008, Cardenas conducted a sale of one pound of methamphetamine, selling one-half pound for $4,000 and "fronting" (selling on credit) the other half. The sale occurred at McDonald's, and as the confidential source departed to deliver the cash to Cardenas at the Property, Cardenas called him and directed that he meet at a gas station rather than the Property. At the gas station, Cardenas entered the vehicle and rode with the confidential source to another gas station, where the money was exchanged. (Doc. 1-1 ¶ 15-16; Doc. 15-1 ¶ 8.) Law enforcement determined that the methamphetamine had come from a "stash house," not from the Property. (Doc. 1-1 ¶ 16; Doc. 15-1 ¶ 11.)

A third purchase from Cardenas, for three pounds of methamphetamine, was arranged. The purchase did not occur, however, but only because police conducted an unrelated traffic stop of Cardenas' confederate and discovered one pound of methamphetamine in the vehicle. The confederate was arrested, and Cardenas disappeared. A warrant for Cardenas' arrest for

7

conspiracy to traffic in methamphetamine was issued and Cardenas, who was not found, remains a fugitive. Police searched the Property pursuant to a warrant but found no controlled substances. (Doc. 1-1 ¶ 17; Doc. 15-1 ¶¶ 11-12.) The Property was also searched in late 2009, but again no controlled substances were found. (Doc. 15-1 ¶ 14.)

## B. Financial Evidence and Claimant's Relation to the Property

Claimant asserts she is married to Cardenas[3] and has a marital interest in the Property. (Doc. 15-2 at 3.) Although initially stating she did not have a Social Security number (Doc. 15-2 at 1), she subsequently stated she was issued one for the purpose of filing a tax return, although she did not specify when the number was issued (Doc. 15-3 at 1 (Supplemental Answers to Interrogatories (unredacted))). Since April 2008, when Cardenas fled, she has relied largely on public benefits and on relatives for living expenses for her and her children, supplemented by some income for house cleaning work. (Doc. 15-2 at 3-5.) Since July 2010, she has received food stamps in the amount of $800.00 per month, and her children have had government medical insurance since birth. She also received

---

[3] Claimant is unable to provide a marriage certificate or other marriage document but states that she and Cardenas were married in Mexico. (Doc. 20 at 5; see Doc. 15 at 11 n.2 (citing discovery documents).) Because the Government does not challenge marital status for purposes of its summary judgment motion (Doc. 15 at 11), the court will assume Claimant and Cardenas are married.

8

gifts in the form of others paying some of her expenses. (Doc. 15-2 at 6; Doc. 15-3 at 4.) Mortgage payments on the Property were about $900.00 per month, and other expenses varied. (Doc. 15-3 at 4-5.)

Claimant provided federal tax returns for tax years 2004 through 2006, which she asserts were filed jointly with Cardenas.[4] The Government attached the joint returns to its motion for summary judgment. The unsigned joint returns and W-2 forms show gross income of $2,183.00 and 5 dependents for 2004 (no federal tax due with a refund of $167.00 due for additional child tax credit, plus a $103 state tax refund due); gross income of $10,838.00 with 3 dependents for 2005 (no federal tax due but a refund of $979 for additional child tax credit due, plus a $280 state tax refund due); and gross income of $31,785.00 with 3 dependents for 2006, the year in which Cardenas purchased the Property. (Docs. 15-5 through 15-9.) The net income for Cardenas and the Claimant for 2006 is $27,695.31 (gross income of $31,785.00 plus tax refunds of $1,259.00 less tax and Social Security withholdings of $5,348.69).[5] The tax returns reflect no interest income, and no

---

[4] The Government initially challenged the authenticity of the federal tax returns but has now advised the court that "there is no reason to believe that the tax returns produced by Claimant in discovery are not materially correct copies of filed returns." (Doc. 22 at 5.)

[5] In April 2004, the Internal Revenue Service filed a "Notice of Federal Tax Lien" against Cardenas in the amount of $6,265.19 for 941

tax returns for the period after tax year 2006 are in the record.

Claimant has not "generally been employed outside the home," with the exception of 2004 when she earned a total of $2,183.02 from temporary services jobs. (Doc. 15-3 at 3; Doc. 15-6 (2004 W-2 form for Veronica Enciso).) She currently earns "a few hundred dollars" each month as a house cleaner. (Doc. 15-2 at 5.) Her only assets are checking and savings accounts and her claimed marital interest in the Property. (Doc. 15-2 at 7.)

Claimant asserts, and the Government concedes, that she and her children have resided at the Property since the date of purchase, including after Cardenas fled. (Doc. 15-2 at 9; Doc. 20 at 5-7.) Various of Cardenas' relatives have resided at the Property from time to time, including his parents, who paid expenses related to the Property since June 2009, and his sister who, since February 2010, pays $300 per month in rent. (Doc. 15-2 at 9.) From October 2006 through April 2008, however, no other relative who resided at the Property contributed to the mortgage obligations. (Id.)

Claimant states that Cardenas paid the mortgage from the

(payroll withholding) taxes for tax year 2002. (Doc. 15-11.) The record does not reflect that this lien was satisfied or whether any refund due for tax years 2004 through 2006 was withheld in partial satisfaction of the lien.

purchase of the Property in 2006 until he fled in April 2008 from sums he earned as an employee of Tower Guys, Inc., and as owner/operator of GCC Construction. From April 2008 on, Claimant states, mortgage payments were made by various named relatives of Cardenas. (Doc. 15-2 at 3 (unredacted).) Purported W-2 forms attached to the federal tax returns reflect employment with Tower Guys, Inc. in 2005 and 2006. (Docs. 15-8, 15-10.)

In addition to these relatives, Cardenas' brother, Abel Cruz Cardenas, lived at the Property at various times. The brother, who had no known source of income at the time, was arrested in September 2009 after a stop of his vehicle revealed cocaine and a revolver. (Doc. 1-1 ¶ 18; Doc. 15-1 ¶ 13.) The brother was subsequently convicted in state court of felony sale of a schedule II controlled substance based on a different offense. (Id. ¶ 19.)[6] According to Claimant, Cardenas' brother paid no rent. (Doc. 15-2 at 9.)

_____

[6] Although Claimant asserts that the Declaration of C.J. Diamont ("Diamont Declaration") lists an incorrect offense date for Cardenas' brother, the Government asserts the date given by Diamont (September 20, 2009) refers to a different encounter with police than that leading to state court conviction. The Government's assertion agrees with the federal indictment brought against Cardenas' brother. See United States v. Abel Cruz Cardenas, No. 10-cr-227-1 (June 28, 2010), Doc. 1 (listing firearm possession offense date of on or about September 20, 2009, the same date in Diamont's Declaration). Thus, Claimant does not raise an issue as to the reliability of the Diamont Declaration on this point or generally. The Carter Declaration references the same September 20, 2009 traffic stop (Doc. 1-1 ¶ 18)

## III. ANALYSIS

The Government's motion raises three issues: (1) whether Claimant's verified notice of claim and answer should be struck because she lacks standing to contest forfeiture; (2) whether the Government is entitled to summary judgment against the Property pursuant to 21 U.S.C. § 881 and 18 U.S.C. § 981 because the Property was derived from or traceable to a drug transaction and was used or intended to be used to commit or facilitate a violation of the Controlled Substances Act; and (3) whether Claimant, if she has standing, can establish that she is an "innocent owner" of the Property when her claim to being an "owner" is predicated upon a marital interest under North Carolina law. (See Doc. 15 at 7-8.)

### A.  Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(a), summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." T-Mobile Northeast LLC v. City Council of Newport News, Va., 674 F.3d 380, 385 (4th Cir. 2012), cert. denied, 133 S. Ct. 264 (2012). "[T]he party seeking summary judgment bears an initial burden of demonstrating the absence of a genuine [dispute] of material

---

and, in a separate paragraph, notes a state drug conviction of Cardenas' brother (id. ¶ 19).

fact." Bouchat v. Baltimore Ravens Football Club, Inc., 346
F.3d 514, 522 (4th Cir. 2003) (citing Celotex Corp. v. Catrett,
477 U.S. 317, 323 (1986)).

When assessing a motion for summary judgment, the court
views all facts and draws all reasonable inferences therefrom
"in the light most favorable to the nonmoving party." Newport
News Holdings Corp. v. Virtual City Vision, Inc., 650 F.3d 423,
434 (4th Cir. 2011), cert. denied, 132 S. Ct. 575 (2011). "A
genuine question of material fact exists where, after reviewing
the record as a whole, a court finds that a reasonable jury
could return a verdict for the nonmoving party." Dulaney v.
Packaging Corp. of Am., 673 F.3d 323, 330 (4th Cir. 2012). This
standard applies in civil forfeiture actions. See, e.g., United
States v. $94,200.00 in U.S. Currency, No. 1:11CV00609, 2012 WL
2885129, at *4 (M.D.N.C. July 13, 2012).

### B. Whether Claimant Has Standing to Contest Forfeiture

The Government moves to strike Claimant's claim and answer
on the grounds she lacks standing.[7] The Government assumes, for
purposes of its motion, that Claimant has both statutory and
Article III standing. It challenges only whether she has
prudential standing.

---

[7] Although the Government files no separate motion to strike, Rule
G(8)(c) of the Supplemental Rules for Admiralty or Maritime Claims and
Asset Forfeiture Actions permits the Government, before trial, to move
by summary judgment to strike a claim or answer because the claimant
lacks standing.

13

As an intervener in an _in rem_ action, Claimant must establish standing by a preponderance of the evidence. <u>See</u> Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, Rule G(8)(c)(ii)(B). "Prudential standing encompasses several judicially-created limitations on federal jurisdiction, 'such as the general prohibition on a litigant's raising another person's legal rights . . . and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked.'" <u>CGM, LLC v. BellSouth Telecom., Inc.</u>, 664 F.3d 46, 52 (4th Cir. 2011) (quoting <u>Allen v. Wright</u>, 468 U.S. 737, 751 (1984)). Congress legislates against the background of the Supreme Court's prudential standing doctrine, "which applies unless it is expressly negated." <u>Bennett v. Spear</u>, 520 U.S. 154, 163 (1997). "Unlike Article III standing, issues of prudential standing are non-jurisdictional and may be pretermitted in favor of a straightforward disposition on the merits." <u>United States v. Day</u>, 700 F.3d 713, 721 (4th Cir. 2012) (internal quotation marks omitted).

To evaluate prudential standing in this civil forfeiture case, therefore, the court "must identify what interest the litigant seeks to assert and then decide if that interest is arguably within the zone of interests to be protected or regulated by the statute." <u>United States v. $500,000.00 in U.S.</u>

14

_Currency_, 591 F.3d 402, 404 (5th Cir. 2009).[8]   Under the applicable civil forfeiture scheme, an "innocent owner" holds the right to defend against the civil forfeiture statute.   _Id._ at 404 (citing 18 U.S.C. § 983(d)(1) ("An innocent owner's interest in property shall not be forfeited under any civil forfeiture statute.")).

Here, Claimant does not assert prudential standing by way of another, that is, Cardenas, but asserts that she falls within the zone of interests which the forfeiture statutes sought to protect as an "innocent owner."  (Doc. 20 at 4-7.)[9]

---

[8]  The question presented to the court is whether Claimant has any sort of legal title or beneficial interest in the Property.   When a claimant has undisputed legal title but is challenged as having only a nominal interest, some courts view the issue not as one of standing but as an element of the innocent owner's claim on the merits.   _See e.g._, _United States v. One 1990 Beechcraft 1900C Twin Engine Turbo Prop Aircraft_, 619 F.3d 1275, 1277 n.3 (11th Cir. 2010).

[9]  Both parties consider ownership, in large measure, in the context of "innocent owner," a term in the statute, but treat the issue as one of prudential standing.   Although all termed "standing," the differences between statutory, constitutional, and prudential standing are important.   "Constitutional and prudential standing are about, respectively, the constitutional power of a federal court to resolve a dispute and the wisdom of doing so.   Statutory standing is simply statutory interpretation: the question it asks is whether Congress has accorded <u>this</u> injured plaintiff the right to sue the defendant to redress the injury."  _CGM_, 664 F.3d at 52 (favorably quoting _Garden v. Conexant Sys., Inc._, 496 F.3d 291, 295 (3d Cir. 2007)).   In a case where the question is whether Congress intended to confer standing on a litigant to bring an action under the statute at issue, the court's task is essentially one of statutory construction.   _CGM_, 664 F.3d at 52-53.   In this case, although the court is determining whether Claimant is an "owner," with respect to standing, the court's inquiry turns on Congressional intent that ownership interest be determined by state law and whether that interest falls within the zone of protection intended by Congress with respect to a claimant in a forfeiture case.

Claimant limits her prudential standing claim to her assertion that she is an "owner" of the Property, citing 18 U.S.C. § 983(d), which sets forth the "innocent owner" defense to a forfeiture action. (Doc. 20 at 5.) "An innocent owner's *interest in* property shall not be forfeited under any civil forfeiture statute." 18 U.S.C. § 983(d)(1) (emphasis added). If the court determines that an innocent owner has a partial interest in property otherwise subject to forfeiture, or a joint tenancy or tenancy by the entirety, the court may order severance of the property, transfer to the Government with a provision the innocent owner be compensated to the extent of his or her ownership interest, or permit the innocent owner to retain the property subject to a lien in favor of the Government to the extent of the forfeitable interest. Id. § 983(d)(5).

An "owner," for purposes of subsection 983(d), is "a person with an ownership interest *in the specific property sought to be forfeited*, including a leasehold, lien, mortgage, recorded security interest, or valid assignment of an ownership interest." 18 U.S.C. § 983(d)(6)(A) (emphasis added). On the other hand, a person with only a general unsecured interest in, or claim against, the property of another or who is a bailee of or exercises no dominion or control over the property is not an owner for purposes of the innocent owner defense. Id. § 983(d)(6)(B). Against these general examples of inclusion and

16

exclusion, it has been said that the term "owner" must be construed broadly "to include any person with a recognizable legal or equitable interest in the property seized." United States v. 92 Buena Vista Ave., 937 F.2d 98, 102 (3d Cir. 1991) (quoting 1978 U.S. Code Cong. & Admin. News at 9522-23), aff'd, 507 U.S. 111 (1993).

Claimant concedes she does not hold legal title to the Property, which is titled only in Cardenas' name. The question, therefore, is whether she has an equitable interest in it.

Property interests are determined under state law. The court, therefore, must look to the law of North Carolina, where the real property is located. See United States v. Salti, 579 F.3d 656, 668-69 (6th Cir. 2009); United States v. 717 South Woodward St., 2 F.3d 529, 535 (3d Cir. 1993).

Claimant asserts that she has a marital interest in the Property because, under North Carolina's equitable distribution statute, "marital property" consists of all real and personal property acquired by either spouse during the course of the marriage and before the date of separation. N.C. Gen. Stat. § 50-20(b)(1).[10] However, while the effect of the statute is to

---

[10]  Because title to the Property names Cardenas only, and not Claimant, she is not an owner under tenancy by the entirety, tenancy in common, or joint tenancy. Following the introduction of no-fault divorce in North Carolina, pressure mounted for the state to follow the lead of other states in adopting statutes based on community property or equitable distribution principles. The North Carolina General Assembly responded in 1981 by enacting "An Act for Equitable

give the non-titled spouse an equitable claim in marital property, the statute does not displace traditional principles of property ownership. As recognized by this court in a bankruptcy proceeding which considered North Carolina's equitable distribution statute, "[t]he mere classification of separately-titled property as 'marital property' does not give one spouse an equitable title to or an interest in the separately-owned property of the other. Courts interpreting North Carolina's equitable distribution statutes have uniformly reached this conclusion." In re Halverson, 151 B.R. 358, 362 (M.D.N.C. 1993) (citing cases). "Thus, in the absence of an equitable distribution under N.C.G.S. § 50-20, the state of the title of property owned by either spouse or by both spouses is unaffected." Hagler v. Hagler, 319 N.C. 287, 290, 354 S.E.2d 228, 232 (1987) ("Nothing in the [equitable distribution statute] creates a new form of ownership such as that recognized in 'community property' states.").

The rights of the parties to an equitable distribution of marital property are a species of common ownership, the rights of the respective parties vesting at the time of the parties' separation. N.C. Gen. Stat. § 50-20(k). The statute does "not create any vested rights in particular marital property; it

---

Distribution of Marital Property," codified as N.C. Gen. Stat. §§ 50-20 and 50-21. McLean v. McLean, 323 N.C. 543, 549, 374 S.E.2d 376, 380 (1988).

18

created a right to the equitable distribution of that property, whatever a court should determine that property is." Wilson v. Wilson, 73 N.C. App. 96, 99, 325 S.E.2d 668, 670 (1985); cf. N.C. Gen. Stat. § 50-21(a) ("At any time after a husband and wife begin to live separate and apart from each other, a claim for equitable distribution may be filed and adjudicated."). The vested right does not create a property right in marital property, nor does separation create a lien on specific marital property in favor of the non-titled spouse. Hearndon v. Hearndon, 132 N.C. App. 98, 101, 510 S.E.2d 183, 185 (1999).

The approach by North Carolina courts has been applied by this court in a forfeiture proceeding under 21 U.S.C. § 881(a) and 18 U.S.C. § 983(d). In United States v. 1999 Starcraft Camper Trailer, VIN # 1SABS02R8X1UR3942, No. 1:05CV273, 2006 WL 2921722 (M.D.N.C. Oct. 10, 2006), the claimant, Ms. Knight, asserted an ownership interest in a camper trailer (which qualified as a "mobile home"), with water/sewer and electrical hookups, subject to the forfeiture action. The court first addressed Knight's argument that she and her husband owned the property as tenants by the entirety under North Carolina law. The court noted that while tenancy by the entirety traditionally applied only to real property, North Carolina by statute extended the common law doctrine to mobile homes. Id. at *2. The court rejected Ms. Knight's tenancy by the entirety

argument, however, because she was not named as a co-owner of the camper in the title document. Ms. Knight then argued that the camper was marital property as that term is defined by the North Carolina equitable distribution statute. The court rejected this argument, essentially the same argument made in this case:

> Assuming that the Camper would be classified as marital property in the event the Knights were to separate and file for divorce and for the equitable distribution of their marital property, such classification, however, does not establish that Ms. Knight is an owner of the Camper. The North Carolina Court of Appeals has explained that "[e]quitable distribution is a statutory right granted to spouses under G.S. 50-20 which vests at the time of separation" and "does not create a property right in marital property." Rather, the equitable distribution statute only creates "a right to an equitable distribution of that property, whatever a court should determine that property is." . . .

> North Carolina law is clear that the equitable distribution statute does not create a substantive property right in any marital property. Ms. Knight cannot establish that she is an owner of the Camper simply because it would be classified as marital property if the Knights were to separate and seek equitable distribution of their marital property.

2006 WL 2921722, at *3-4 (citations omitted). Because Ms. Knight could not establish she was an owner of the camper, her claim of ownership was dismissed. Id. at *4.

Similarly, in this case Claimant, who is not named as a co-owner in the title document, asserts that she is married to Cardenas, but nothing in the record suggests that she or

20

Cardenas have sought equitable distribution of their marital property. Thus, under North Carolina law and 1999 Starcraft Camper Trailer, Claimant does not enjoy an ownership interest in the Property.

This conclusion is consistent with that of other federal courts, applying similar state statutes in forfeiture cases, which have refused to find that a right to equitable distribution of marital property confers ownership independent of an equitable distribution proceeding. E.g., 717 South Woodward St., 2 F.3d at 535-36 (concluding Pennsylvania marital property division law did not confer a present ownership interest solely by virtue of marriage to title owner); United States v. 116 Emerson St., 942 F.2d 74, 79 & n.3 (1st Cir. 1991) (stating that Rhode Island's equitable distribution statute applies only to assignment of property interests during divorce proceedings); see also United States v. Cochenour, 441 F.3d 599, 601 (8th Cir. 2006) (Missouri statute providing tenancy by the entirety ownership of marital property did not provide wife with ownership interest in property owned solely by husband that was subject of drug forfeiture); United States v. 9844 S. Titan Court, 75 F.3d 1470, 1478-79 & n.4 (10th Cir. 1996) (rejecting argument under Colorado law that spouse had current legal or equitable interest in marital property titled in other spouse's name; holding that ownership, no matter how broadly construed in

21

light of the legislative history of 21 U.S.C. § 881, does not encompass mere dominion and control over property titled in another's name), overruled in part on other grounds by United States v. Ursery, 518 U.S. 267 (1996).

Illustrative is United States v. Schifferli, 895 F.2d 987 (4th Cir. 1990). There, the Fourth Circuit affirmed the dismissal of a wife's claim for lack of standing despite her argument that she had an equitable interest in the property under the South Carolina Equitable Apportionment Act, which provided that "[d]uring the marriage a spouse shall acquire . . . a vested special equity and ownership right in the marital property" as defined by the statute. The Fourth Circuit concluded that while the "ownership right" was acquired during marriage, "marital property" did not exist under South Carolina law until "the date of filing or commencement of marital litigation." Id. at 989 n.*. "Consequently, '[t]he ownership right' in 'marital property' . . . cannot attach until that property is created by the filing of marital litigation." Id. Because the wife had not filed or commenced marital litigation, she had no interest in the property at stake, and thus no standing. Id.[11]

---

[11]   Claimant does not argue that 18 U.S.C. § 983(d)(3)(B), which provides limited relief when a primary residence is involved and the property was acquired after the conduct giving rise to the forfeiture had taken place, requires a different result. That section is limited to interests acquired in the property by marriage, divorce, legal

22

Here, the Property is Claimant's residence and served as the marital home before Cardenas became a fugitive. Claimant argues that her marital interest in the Property exceeds that of a leaseholder or mortgagor, whom 18 U.S.C. § 983 specifically defines as innocent owners. (Doc. 20 at 5.) But the equitable interest she asserts is simply not recognized under the statute or North Carolina law. This reality leaves Claimant in a difficult situation. But that results not from the court's decision but from Cardenas' failure to include the Claimant on the deed to the Property. Consequently, because Claimant lacks a cognizable ownership interest in the Property, she lacks standing to contest its forfeiture. The court will therefore strike her claim.

## C. "Innocent Owner" Status of Claimant

Because the court concludes, with respect to standing, that Claimant is not an "owner" for purposes of the civil forfeiture statute, she cannot be an "innocent owner."[12] The Government is

---

separation, or inheritance which, as noted above, are not present here. Id. § 983(d)(3)(B)(iv). Further, the provision does not apply to property that is, or is traceable to, the proceeds of any criminal offense. Id. § 983(d)(3)(B)(iii).

[12] Even if the Claimant were found to have standing, she would not be an "owner," and thus not an "innocent owner," for the same reasons stated in the court's discussion of standing. The court notes that the Claimant's opposition to summary judgment addressed the merits of the motion and that the Government presented information (on which she relied in making her argument), thus placing such evidence in the record for purposes of summary judgment.

therefore entitled to summary judgment on Claimant's "innocent owner" defense.

### D. Government's Forfeiture Claim

The Civil Asset Forfeiture Reform Act of 2000 ("CAFRA") places the burden solely on the Government to establish, by a preponderance of the evidence, that a property is subject to forfeiture. 18 U.S.C. § 983(c)(1); United States v. Currency, U.S., $147,900.00, 450 F. App'x 261, 263 (4th Cir. 2011) (unpublished per curiam opinion) (citing 18 U.S.C. § 983(c)(1)).[13] The Government may use evidence gathered after the filing of a complaint, 18 U.S.C. § 983(c)(2), and may rely on circumstantial proof, United States v. Herder, 594 F.3d 352, 364 (4th Cir. 2010) (citing United States v. 7715 Betsy Bruce Lane, 906 F.2d 110, 113 (4th Cir. 1990) (holding that circumstantial evidence that the house was used to possess cocaine with intent to distribute is sufficient, even if only trace amounts were found)). The determination whether the Government has met its burden is based on "the totality of the circumstances." United States v. $864,400.00 in U.S. Currency, No. 1:05CV919, 2009 WL 2171249, at *2 (M.D.N.C. July 20, 2009), aff'd, 405 F. App'x 717 (4th Cir. 2010).

---

[13] Unpublished decisions of the Fourth Circuit have no precedential value but are cited for the weight they generate by the persuasiveness of their reasoning. See Collins v. Pond Creek Mining Co., 468 F.3d 213, 219 (4th Cir. 2006).

Although Claimant lacks standing, that does not mandate that the Government's summary judgment motion be granted. The Government must still show an entitlement to a forfeiture judgment as a matter of law. See 18 U.S.C. § 983(c)(1); Custer v. Pan Am. Life Ins. Co., 12 F.3d 410, 416 (4th Cir. 1993) ("Although the failure of a party to respond to a summary judgment motion may leave uncontroverted those facts established by the motion, the moving party must still show that the uncontroverted facts entitle the party to 'a judgment as a matter of law.'").

The Government's assertion of an entitlement to civil forfeiture rests on two grounds. The first seeks recovery under 21 U.S.C. § 881(a)(7), which permits forfeiture of "[a]ll real property . . . used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of" a drug felony. The second seeks forfeiture under 18 U.S.C. § 981(a)(1)(C) which, in conjunction with § 1956(c)(7), permits forfeiture of real property that "constitutes or is derived from proceeds traceable to . . . any offense constituting 'specified unlawful activity,'" including dealing in controlled substances, as well as under 21 U.S.C. § 881(a)(6), which subjects to forfeiture "[a]ll moneys . . . or other things of value furnished . . . in exchange for a controlled substance . . . ,

[and] all proceeds traceable to such an exchange." Each ground is addressed in turn.

### 1. Forfeiture of real property used to commit or facilitate a drug offense

The Government asserts civil forfeiture under 21 U.S.C. § 881(a), which applies to "[a]ll real property, including any right, title, and interest (including any leasehold interest) . . . which is used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, a violation of this subchapter punishable by more than one year's imprisonment." 21 U.S.C. § 881(a)(7). The Government has the burden to show, by a preponderance of the evidence, that the Property is subject to forfeiture and that there was a "substantial connection" between the Property and the offense. 18 U.S.C. § 983(c)(1), (3). "Under the preponderance of the evidence standard, the Government must show that the relevant facts are more likely true than not." $864,400.00 in U.S. Currency, 2009 WL 2171249, at *2.

Although CAFRA does not define the term, the Fourth Circuit has held that a substantial connection may be established by showing that use of the property made "the prohibited conduct less difficult or more or less free from obstruction or hindrance." Schifferli, 895 F.2d at 990-91 (internal quotation marks omitted) (interpreting term "facilitate"); see Herder, 594

26

F.3d at 364 (applying <u>Schifferli</u> civil forfeiture definition of "substantial connection" to criminal forfeiture). The standard is a "common sense interpretation of the statute, which is consonant with the congressional intent that the instrumentalities of the drug trade be reached, while ensuring that property only fortuitously connected with drug trafficking be preserved." <u>United States v. Santoro</u>, 866 F.2d 1538, 1542 (4th Cir. 1989). "The hurdle imposed by the 'substantial connection' requirement is not . . . a particularly high one." <u>United States v. Borromeo</u>, 995 F.2d 23, 26 (4th Cir. 1993) (applying pre-CAFRA probable cause standard but addressing showing of "substantial connection" required between the offense and the property), <u>vacated in part on other grounds</u>, 1 F.3d 219 (4th Cir. 1993); <u>United States v. 475 Cottage Dr.</u>, 433 F. Supp. 2d 647, 654 (M.D.N.C. 2006) (recognizing CAFRA preponderance of the evidence standard but quoting <u>Borromeo</u> with respect to the "substantial connection" requirement). While the property must have more than an incidental or fortuitous connection to criminal activity, it need not be integral, essential, or indispensable to that activity. <u>Schifferli</u>, 895 F.2d at 990. Further, controlled substances need not be present at the Property because section 881(a)(7) applies to property used, or intended to be used, to commit or facilitate a drug offense. Reasonable inferences may be drawn from the evidence presented

27

to establish a nexus between the Property and drug activity. See United States v. Veggacado, 37 F. App'x 189, 190 (6th Cir. 2002) (unpublished opinion).

The Government points to the delivery of $6,000.00 in controlled drug buy money to Cardenas in his kitchen at the Property, Cardenas' initial direction (subsequently aborted) to deliver a second drug payment to him at the Property, and the "numerous Hispanic males arriving at the residence for short periods of times [sic]" to meet with Cardenas at the Property during the course of one morning of surveillance (Doc. 15-1 ¶ 7), which the Government asserts is consistent with, and indicative of, drug activity. As noted, no controlled substances were found during any search of the Property.[14] Rather, the evidence before the court is that controlled substances were stored elsewhere, at a "stash house."

The typical factual setting for forfeitures involves a drug dealer who uses real property, often a home, to store or from which to sell illegal drugs. Schifferli, 895 F.2d at 991 (referring to forfeiture action under 21 U.S.C. § 881(a)(7)). Drug sales need not be repeated, however. Congress intended a single felony drug violation to be sufficient to trigger section 881(a)(7). Santoro, 866 F.2d at 1542-43 (finding four drug

_____

[14] Although the court considers the totality of the circumstances, the Government does not argue that the presence of Cardenas' brother at the Property weighs in its favor for purposes of the summary judgment motion, even though he engaged in drug-related activity.

28

sales totaling 12.8 grams of cocaine from the property sufficient, and recognizing that although a home has a protected place in jurisprudence, the courts "cannot sanction a rule that gives favored protection to drug dealers who choose to deal directly from their homes"); United States v. Washington, 948 F.2d 1283 (4th Cir. 1991) (unpublished Table opinion) (finding substantial connection with home, based on the property serving as a "deliberate destination" for single delivery of a package containing heroin, because the property "made the importation of the drug from Nigeria less difficult"); accord United States v. 3402 53rd Street West, 178 F. App'x 946, 948 (11th Cir. 2006) (unpublished per curiam opinion) (recognizing that "[w]e have previously found that one drug sale negotiated and one drug sale completed at a residence was sufficient to demonstrate a substantial connection between the residence and the drug trafficking offense for purposes of forfeiture"; finding substantial connection where two drug sales were conducted on, and 395 grams of cocaine and two pounds of marijuana were seized from, the property).

The Government also points to decisions upholding forfeiture of vehicles that were used to transport individuals to drug transactions. Illustrative is United States v. Thirty Nine Thousand Dollars ($39,000.00) in U.S. Currency, No. 04-2902 ML/AN, 2005 WL 2600217 (W.D. Tenn. Oct. 11, 2005). There, the

29

court granted the government summary judgment on its forfeiture claim as to a pick-up truck used by the drug buyer solely for transportation to the site of an illegal drug transaction (including a separate trip to obtain $39,000 to buy the cocaine).[15]  2005 WL 2600217, at *4; see also United States v. 1966 Beechcraft Aircraft Model King Air A90, 777 F.2d 947, 953 (4th Cir. 1985) (finding substantial connection as to two airplanes used to ferry sellers and, in one case, drugs to a sale, and stating "[i]t is our conclusion that the use of an airplane or other vehicle or vessel in a drug transaction, either to transport controlled substances or to transport conspirators to an exchange site, establishes a 'substantial connection' between the conveyance and the criminal activity sufficient to justify an order of forfeiture").

    In contrast, courts have declined to find a substantial connection under a lesser showing.  For example, in United States v. One 1976 Ford F-150 Pick-Up VIN F14YUB03797, 769 F.2d 525 (8th Cir. 1985), the court found that a pick-up truck used to transport roofing material to a shed near a field where marijuana was grown was not shown to be substantially connected to the drug operation although the driver on the same trip walked into the field and inspected the marijuana crop.  In

---

[15]  The Government has not located any case where only the receipt of funds at a house was found to constitute a substantial connection.

*United States v. Certain Lots in the City of Virginia Beach, Va.*, 657 F. Supp. 1062 (E.D. Va. 1987), the court refused to find that a drug dealer's house had a substantial connection to criminal activity where the dealer agreed to conduct a sale there only after insistence by the informant. The dealer did not keep any drugs at the house but instead picked up the cocaine and scales on his way home from work. The drugs were only at the house for a few hours, and there was no evidence that the house was ever used to store drugs. And in *United States v. Two Tracts of Real Property*, 998 F.2d 204 (4th Cir. 1993), the court affirmed the trial court's denial of forfeiture of real property whose only connection with crime consisted of furnishing a quasi-easement over which drug smugglers hauled contraband. The court noted that "[i]f the phrase 'substantial connection' means anything, it means that for real property to be forfeitable human agency somehow must bear responsibility for the property's 'use' for or 'facilitation' of crime." *Id.* at 212.

Here, the Government's evidence establishes that in March 2008 Cardenas was a drug dealer who had been convicted of trafficking as far back as January 2004 and was engaged in trafficking in April 2008. But the forfeiture statutes focus not just on his status, but on his use of the property to be forfeited. The two drug transactions in question occurred not

31

on the Property in Winston-Salem, but at a parking lot at a McDonald's restaurant in King, North Carolina, some 16 miles away. Only the delivery of proceeds from a single transaction made it to the Property. Clearly, delivery of this single payment to the Property was not a mere fortuity, having been directed by Cardenas. Yet the other payment was purposefully directed away from the Property.

The only additional evidence proffered by the Government is the observation of "numerous Hispanic males arriving at the [Property] for short periods of time[]." (Doc. 15-1 ¶ 7.) It is true that numerous visits of short duration can be consistent with, and indicative of, drug trafficking, especially during a time when a person is known to be engaged in illegal drug sales. See United States v Artez, 389 F.3d 1106, 1114 (10th Cir. 2004) ("Police surveillance which shows an unusually high volume of visitors briefly entering and leaving a residence, consistent with drug trafficking, can also corroborate information from a confidential informant that the residence is being used to distribute narcotics" for purposes of establishing probable cause for a search warrant (internal quotations and brackets omitted)); United States v. Powe, 173 F.3d 853, at *2 (4th Cir. 1999) (unpublished Table opinion) (finding that officers' observation of a number of vehicles arriving at a house, staying for a short period of time, then leaving, corroborated several

pieces of information provided by a cooperating individual, providing officers with reasonable articulable suspicion of drug trafficking sufficient to justify stop of vehicle). However, the standard here is not reasonable articulable suspicion or even probable cause, but rather proof of a "substantial connection" by a preponderance of the evidence. Moreover, the Government's evidence on this point is found in two declarations that are largely conclusory and certainly silent as to how many males visited over what period of time. Unlike many of the real property cases, there is no evidence in the record that actual drug transactions ever occurred at the Property, or that any drugs (even trace amounts) or paraphernalia were ever stored or found there. Compare 7715 Betsy Bruce Lane, 906 F.2d at 113 (finding of only trace amounts of drugs did not prevent finding of probable cause that house was used to distribute drugs), and United States v. Two Real Properties Situated in Bluefield, Mercer Cnty., W. Va., Civil Action No. 1:06-0532, 2009 WL 3181453, at *6 (S.D.W. Va. Sept. 29, 2009) (finding substantial connection where property was used by drug traffickers as place to live, meet, and receive cell phone invoice for service), with Certain Lots in the City of Virginia Beach, 657 F. Supp. at 1065 (finding no substantial connection where there was no evidence claimant used house to store or hide drugs and what drugs were

found were in the house only briefly and at the government informant's insistence).

The court cannot say that the Government has demonstrated on the current record sufficient evidence of a "substantial connection" between the Property and illegal drug activity to entitle it to judgment as a matter of law. Consequently, its motion on this basis will be denied.

### 2. Forfeiture of property as the product of drug proceeds

The Government's second basis for forfeiture rests on 18 U.S.C. § 981(a)(1)(C) which, in conjunction with § 1956(c)(7), permits forfeiture of real property that "constitutes or is derived from proceeds traceable to . . . any offense constituting 'specified unlawful activity,'" including dealing in controlled substances, as well as under 21 U.S.C. § 881(a)(6), which subjects to forfeiture "[a]ll moneys . . . or other things of value furnished . . . in exchange for a controlled substance . . . , [and] all proceeds traceable to such an exchange." "Proceeds" for purposes of section 881(a)(6) includes "real property which was purchased with proceeds traceable to drug transactions." United States v. 630 Ardmore Drive, 178 F. Supp. 2d 572, 577 (M.D.N.C. 2001) (quoting United States v. Fed. Nat'l Mortg. Ass'n, 946 F.2d 264, 265 (4th Cir. 1991)). Proceeds need not be tied to any particular

34

identifiable drug transaction. _United States v. 1982 Yukon Delta Houseboat_, 774 F.2d 1432, 1435 n.4 (9th Cir. 1985). Moreover, the real property need not be purchased in full with illegal drug proceeds, but the proceeds must contribute to the purchase. _Two Real Properties Situated in Bluefield_, 2009 WL 3181453, at *5-6 (granting forfeiture where illegal proceeds used to pay real property mortgage); _see United States v. One Parcel of Real Property_, 921 F.2d 370, 376 (1st Cir. 1990) (applying the "aggregate of facts" to forfeiture determination and concluding government could demonstrate that down payment and mortgage payments were traceable, for the most part if not entirely, to illegal drug proceeds; reversing dismissal of civil forfeiture proceeding (applying then-existing probable cause standard)); _United States v. 2556 Yale Ave._, 20 F. Supp. 2d 1212, 1217-18 (W.D. Tenn. 1998) (denying motion to dismiss complaint alleging that real property in question had mortgages and that proceeds traceable to the exchange of a controlled substance were used to make payments on those liens to avoid foreclosure); _cf. United States v. 5443 Suffield Terrace_, 209 F. Supp. 2d 919, 919-20, 923 (N.D. Ill. 2002) (denying motion to dismiss and permitting government forfeiture action, which alleged proceeds traceable to specified unlawful activity were used for mortgage payments on home (and home was used to conceal contraband), to continue).

Insufficient legitimate income to explain expenditures, along with evidence of drug trafficking, is evidence of property derived illegally. United States v. $4,266.75 in U.S. Currency, No. 1:07cv00565, 2008 WL 5234346, at *4 n.5 (M.D.N.C. Dec. 12, 2006); see United States v. $174,206.00 in U.S. Currency, 320 F.3d 658, 662 (6th Cir. 2003) (giving controlling weight to evidence that "the Claimants' legitimate income was insufficient to explain the large amount of currency found in their possession"); Currency, U.S., $147,900.00, 450 F. App'x at 264 (unpublished per curiam opinion) (citing and quoting $174,206.00 in U.S. Currency, 320 F.3d at 662, as "holding that 'evidence of legitimate income that is insufficient to explain the large amount of property seized' satisfies the preponderance of the evidence standard"); United States v. Thomas, 913 F.2d 1111, 1114-15 (4th Cir. 1990) (noting evidence that defendant's verifiable income could not possibly account for level of wealth displayed and strong evidence defendant is a drug trafficker supported probable cause to believe wealth was traceable to illegal drug proceeds).[16]  "The mere allegation of a highly

---

[16] Thomas was decided prior to enactment of CAFRA, which increased the Government's burden from showing probable cause for forfeiture to proving that the property is subject to forfeiture by a preponderance of the evidence. Thomas is of relevance here, however, because factors that weighed in favor of forfeiture in the past continue to do so post-CAFRA, although subject to the higher burden of CAFRA. $4,266.75 in U.S. Currency, 2008 WL 5234346, at *4 n.5 (citing United States v. Funds in the Amount of Thirty Thousand Six Hundred and Seventy Dollars ($30,670.00), 403 F.3d 448, 469 (7th Cir. 2005)).

unlikely legitimate source of income without some support to give the allegation credibility cannot constitute an issue of material fact defeating summary judgment for forfeiture." $94,200.00 in U.S. Currency, 2012 WL 2885129, at *6 (citing cases); see United States v. $13,963.00, More or Less, in U.S. Currency, Civil Action No. 3:07-0470, 2009 WL 3293852, at *4 (S.D.W. Va. Oct. 13, 2009) ("In the context of civil forfeitures, courts have found this [preponderance of the evidence] burden met and summary judgment is appropriate where a claimant drug dealer fails to show that money was derived from legitimate sources." (citing cases)), aff'd, 382 F. App'x 268 (2010) (unpublished per curiam opinion).

Here, the joint federal tax returns for Cardenas and his wife demonstrate that in 2004 their gross income was $2,183, in 2005 it was $10,838, and in 2006 it was $31,785. While it is theoretically possible, but unlikely (given the family's dire straits[17]), that Cardenas' $7,516.94 down payment on the Property in October 30, 2006, could have come from legitimate 2006 net income, it is inescapable that the family's legitimate income was insufficient to cover the purchase of *both* properties in

---

[17] The family had several children, had to buy groceries beyond the free school lunches and $800 a month in food stamps it received beginning in 2010, was dependent on Medicaid for all medical expenses, and had Cardenas' two brothers living at the Property (neither of whom contributed to the rental income). (Doc. 15-2 at 6, 9; Doc. 15-3 at 4-5.) Family members paid house expenses, including the mortgage. (Doc. 15-2 at 6, 8; Doc. 15-3 at 4-5.)

2006, a total of $62,616.94 – nearly twice the couple's income for the three-year period.

More importantly, and dispositive, however, is the fact that there is no record of legitimate income or federal tax returns filed for Cardenas or his wife after tax year 2006. Thus, for 2007 and through April 2008 when Cardenas fled, the Government's evidence establishes, the mortgage payments on the Property were approximately $900 a month. (Doc. 15-3 at 4.) This amounted to $13,500.00 in mortgage payments during a time when Cardenas was involved in drug trafficking and neither he nor his wife had any known source of legitimate income. So, even assuming the down payment on the Property derived from legitimate sources, the cost of both the Property and the additional parcel in 2006 eliminates any possibility that the mortgage payments for 2007 and first quarter of 2008 could have derived from either prior or contemporaneous income. The Government has therefore demonstrated as a matter of law that it is more likely than not that at least the funds necessary to pay the mortgage in 2007 and through April 2008 when Cardenas fled were derived from Cardenas' illegal drug activity. See Two Real Properties Situated in Bluefield, 2009 WL 3181453, at *5 (forfeiture granted based on mortgage payments in absence of sufficient income from legitimate sources to pay off the mortgage).

Thus, the court finds that the Property constitutes proceeds traceable to the distribution of a controlled substance. The Government's motion for summary judgment will therefore be granted on this basis.

## IV. CONCLUSION

For the reasons set forth above,

IT IS ORDERED that Plaintiff United States of America's Motion for Summary Judgment (Doc. 14) is GRANTED.

A separate judgment will issue.


                                    /s/   Thomas D. Schroeder
                                    United States District Judge


March 22, 2013